Ms. Clark, will you call the next case please? 3-12-0231-1014, Appellant, Thomas Duda v. The University Park Police Pension Fund at all, Appellate, Charles Atwell, and Village of University Park, Appellee, Robert Swain. Good morning, your honors. My name is Thomas Duda. May it please the court, also for the defense, or for the appellees, I would like to reserve seven minutes for rebuttal. You'll have five minutes. That's all? Okay. In any event... You don't have to reserve it. Okay. Unless you want to. I'm sorry? No, that's fine. The present case involves an appeal from an adverse decision denying line-of-duty disability benefits to Officer Buckner. The issues break down into two pieces. The first is this police officer became disabled as a result of two separate injuries leading to two separate back fusions, both of which the evidence shows were causative factors in the ultimate disability. The second is, if the only accident that disabled this police officer was the most recent accident, whether it occurred under circumstances that constituted an act of duty. The first issue, in my opinion, is judged under the clearly erroneous standard because it involves an application of factual issues to a standard of causation, and under the Wilford case, that's the standard. Whether or not her behavior in April of 2006 was an act of duty is a legal interpretation, and in my opinion, that is a de novo standard of review. I'm going to argue to the court under the manifest weight of the evidence standard because what I would hate to see happen on the first half of this case is for the court to say, well, if we did the clearly erroneous, Mr. Duda would win, but we think he had the wrong standard. So I'm going to suggest under either clearly erroneous or manifest weight, Officer Buckner overwhelmingly proved her case. The fact that there is a single medical report of Thomas Gleason that the board might rely upon to say, well, we gave weight to Dr. Gleason's report and we have a right to choose these reports, therefore you have nothing to worry about, doesn't solve the problem. Even under the manifest weight of the evidence standard, the courts have held that even if the decision is supported by some evidence, which if it were alone and undisputed would support the decision, if in the record as a whole it does not, this court has an obligation to review the facts and to reverse the decision. Clearly the first accident that happened April 29, 2001 was the result of an act of duty. It led to this police officer having a lumbar fusion surgery and she returned to work with restrictions. On record, page 485, her treating surgeon unequivocally stated that she had a restriction. She could not lift over 25 pounds at the time she was released to return to work. That is the only medical evidence in the record establishing what her physical capabilities were. There is no medical evidence conflicting with that. Dr. Gleason doesn't conflict with that, Dr. Mercier doesn't conflict with that, and Dr. Malik actually supports that version of the facts. Now she returns to work and she doesn't return to patrol duties. She returns to investigation duties. And there is a tremendous amount of argument by the village and the board that there is no light duty and therefore they couldn't accommodate a restriction of 25 pounds. The unrebutted testimony is for investigations there are no duties that required her to lift over 25 pounds. She returned to work for a few months and was then transferred to a special police operative force in conjunction with the state police. She did that work for I think two, two and a half years with a group called CPAT. Now even though my opponents indicate that I attribute Gary Reichenberger's testimony to be that she was on light duty, that's not what the record shows. What the record shows is that she worked under the close supervision of a state police officer named Gary Reichenberger. He had no idea anything about her physical condition. He had no idea what her physical restrictions were. He doesn't allow people to work for him with physical restrictions, but he didn't know what hers were. What he did know is, and he testified to this unequivocally, I think it begins in the record at page 160, that Officer Buckner was a unique asset and she was given very explicit instructions. This particular task force was to investigate complicated and long-term conspiracies, narcotics and gambling. And her job was only to purchase narcotics in order to finalize the transaction for further police efforts. She was expressly advised not to get involved in a struggle. She was not to attempt to engage in an arrest. And she was not supposed to attempt to apprehend anyone. So clearly she is being told you should only work within the work restrictions of the doctor. The motivation of Reichenberger wasn't the restrictions. His motivation was that he didn't want to expose her identity. But no matter what his motivation was, the reality is that she was performing work with a 25-pound work restriction from 2002 all the way until 2006. Once she returned to investigations, again she was never, with one exception, required to work beyond her restrictions. And the witness that is relied heavily upon by the board in support of its decision is Deputy Chief Box. In 2002 he was not her supervisor. In 2002 her return to work was made with the Chief Martin. And we quoted in our reply brief the exchange between Deputy Chief Box and the people who were interrogating him that during the course of her working for him, she asserted that she had a work restriction and that certain assignments that were given to her in investigations were assignments she physically couldn't perform and that they exceeded her restrictions. Our argument was characterized by the defendants as quote self-serving. But the reality is her testimony is supported by her doctor. Her testimony is supported by the only medical witness who has any evidence in this record. And therefore it is against the manifest weight of the evidence for the board to say that the 2001 accident was not a causative factor in the ultimate cause of death. Inability of this police officer to engage in her activities. Which brings me to the question of the application for benefits. Because the village makes a huge point that she didn't apply for benefits on the 2001 accident and therefore she's barred by latches and all sorts of things. Page 255 contains, the record page 225, contains her typewritten four paragraph single spaced application for benefits with this pension fund and it relates from beginning to end what happened. And what her application says is, in 2007 I was released to return to work by Dr. Sweeney. I had exactly the same physical restrictions and limitations in 2007 as I had in 2001. In 2007 you wouldn't allow me to return to work. In fact in 2007 you told me that I was going to be placed on AWOL status and that if I didn't apply for disability now you were going to fire me. Well that didn't happen in 2001. So all of this argument about latches and everything else, if this person had applied for benefits in 2002 she wouldn't be eligible because she's working. A person who's working is not disabled. So the triggering event that led to the application wasn't a change in her physical condition. It was a change in the village's response to her physical condition. It was only in 2007 that she was not allowed to return to work, which prompted the application. Now the handwritten application doesn't specifically cite the 2001 accident, but the typewritten request for an application clearly cites the 2001 accident. And after the 2001 accident, she was off work for about eight months? I think it was about a year. I actually think the two are pretty similar, the amount of time she was off of work. And she was receiving disability or something while she was having the fusion and doctoring in 2001? Well, candidly it's not in the record, but my suspicion would be that she was receiving what are called PETA benefits. Under 5 ILCS 345-1 police officers get full pay for 12 months if they can't do their job. So she was probably receiving her full pay. And she was getting her full pay. I think the reason what brought this to a head is that in April of 2006 she's hurt. She gets full pay under PETA for 12 months. So in February of 2007 her PETA benefits are coming to an end. This isn't in the record. I guess the reason I was asking is that when you go back to work... Your Honor, you really propped me. The important thing to understand is that when she made an effort to return to work and it was refused, not only did Dr. Sweeney in his record say that she has restrictions, he says she has the same restrictions she did before. And then he goes on to say, I don't understand why they didn't respect the restrictions I made in 2002, but she is in precisely the same position now as she was back then. And that's what I'm getting to is when she goes back to work in 2002, she's not just allowed to come back to work and say I'm okay. I mean, she has to present something saying that she's released. Chief Martin was subpoenaed, but he never appeared to testify. She returned to work through Chief Martin. Not through Chief Box. Deputy Chief Box. Actually at the time he wasn't a deputy chief. And so when the pension fund talks about the board weighed the three medical opinions, what the board doesn't tell this court is that that's not the only medical evidence that it had in the record before it. The medical evidence it had in the record before it were the treating records. And Dr. Sweeney's, I think his November statement is really pregnant in terms of the fact I don't understand why this lady can't return to work today. She has exactly the same restrictions that she had in 2001. Now I'm not saying that the 2006 episode had no effect on this client, but what I'm saying is that these two accidents combined to end her career. The first accident didn't end her career because she did work. But the two episodes combined ended her career. And the cases that I cite to this court, Rose is a police case. Rose versus the Mount Prospect Police Pension Fund. But there are innumerable workers' compensation cases that I cite to this court. Vogel versus I can't remember the name of the employer, where it has long been held that an injury that is a causative factor in ultimate disability, even though the person returned to work and eventually a subsequent episode took the weakening of the physical structures and made them now disabling, that as long as the original injury set up a weakened physical condition, causation is established. And the evidence in this case, the manifest weight of the evidence, I'm not asking this court to reweigh this case. I'm asking this court to look at the facts of this case and apply the correct standard of law, which the pension board failed to do. The second question is whether this police officer's accident in 2006 was the result of an act of duty. And I'm very ginger about this because when I got ready for oral argument today, I went to LexisNexis and I looked up White versus City of Aurora and they haven't shown that it's overruled, reversed, perfect. So I don't want to do anything that rocks the boat. The seminal case is Jones and Fittsvall. These are two police cases involving patrol officers. And what Jones stands for, the proposition is an automobile accident by a police officer on patrol is an act of duty. It is a special risk of being a patrol officer. This police officer had completed her shift and what, in my opinion, places her in the Jones case. The last thing I want this court to do is to distinguish Jones. What makes this fit in Jones is she had special status. She was given an unmarked squad car to drive 24 hours a day. She was on call 24 hours a day, which in my opinion places her in an elevated status of risk that would make what happened to her in that automobile something that occurred in the act of duty. So the question is, you have the Jones case, you have the Filscoff case. I think this fits in the line between the two. But I agree that she was finished with her shift. She was on the way home. And what distinguishes the case is that she had a squad car. She was called at all times so that even if the only accident that caused her disability was the second accident, it would be the result of an act of duty. I appreciate the court's attention. We raised a constitutional issue in terms of this board. It's a five-member board and I'm not claiming the Open Meetings Act was violated. But under the Open Meetings Act, this lady to get a line of duty disability needs three votes. She can't do it with a majority of a quorum. So if you don't have two members of the board, you've severely limited her ability to get a full hearing because she needs three. There's a five-member board. There are only three out of five appointed. That means she's got to convince everybody. Thank you very much for your time and attention. Thank you, Mr. Bierda. And Mr. Adwell, you are going to argue for ten minutes? Yes. And Mr. Swain. Thank you, Your Honors. Please, the court, my counsel here today must say that I'm offended if the court has overruled the White decision. That was my case in the Second District. I'm hurt by that. But in any event, we can go through the litany of cases in this matter. We're not responsible. I'm sorry? I said we're not responsible. I understand that. Let me point out a few points here. I'm not sure when we talk about review under this clearly erroneous standard whether it's manifest weight, but I do know in this particular case that there are a couple of points of law that I believe really have no significance in this particular matter. It's all reviewed according to the facts in this case. First, as far as the constitutional arguments, I should submit that those were not addressed before the administrative board, due process arguments. In addition to that, the board did have a quorum as required under the Open Meetings Act, and it was a unilateral decision in that particular matter. So that should be a non-issue. The only matter that might be an issue in this particular case as far as a legal issue is the argument of capacity or the application of active duty under the 114.1 for line of duty disability, which I'll get to in a moment. But I believe that once we touch on that issue, the court will realize that that is really a non-issue in this case because they're asking for application, the plaintiff is in this particular matter, to a wholly off-duty accident. That's why the legislature created two separate statutes, one for line of duty, active duty, the other one for anything else that happened for a disability, whether it be off-duty or on-duty. So I'll touch on that in just a moment, if you will. The facts of this particular case. First of all, our argument, and I believe the village's argument, is that the application provided for the ability to cite what injuries, what accidents, were the basis for the request of relief. In that application, 2001, was not cited. The application places in motion the jurisdiction of the board, the board's statutory authority to hear. The board has to know what's going on before we can select three physicians to have an application. And that's what the applicant examined as required by the statute. But let's get for a moment to the evidence as far as the medicals. Three selected physicians by the board. Dr. Malik, which counsel referred to in this particular case, very abbreviated opinion, maybe one paragraph, maybe a page, no definition to it at all, basically says degenerative disc disease, disabled, 2001 implication, 2006 implication. Because all doctors are provided all the medicals which may go back for 20 years for the IME examination. Dr. Gleason, very detailed report, says disabled. The cause of that is solely 2006. That's what he states. Same medicals that they have access to. Dr. Mercier, in his opinion, basically states, not disabled. Causation wasn't even an issue because it said the back is better than ever, you can go back to full duty. However, the board interpreted those medicals for the benefit of the applicant and granted the non-duty disability in that particular case. Let's further go into this talk of light duty and restrictions that the applicant has stated from approximately 2002 through and inclusive to almost 2006. Anybody knows here today that no Article 3 police or Article 4 fire downstate department has access to full time light duty positions. They just can't afford it. They don't have it. And the chief, deputy chief, Box, in this matter, testified that there is no permanent light duty. So she was not on light duty and the chief and her superiors at CPAP were also acknowledged the fact that she had to be a full term, full duty police officer. She's testified basically to the same. She talks about investigations or the sergeant, that being the assumed duties were light duty. It doesn't make any difference what that officer's duties are. As far as the assignment, it matters that they're capable of performing full duty, whether they have to or not. And Deputy Chief Reckenberger actually stated in CPAP, we would not hire her, we can't hire her, on assignment, if there is any need to. And nobody was apprised of any medical restriction in this case. We talk about Chief Martin. Chief Box says Chief Martin would have access to that and he would have access to any medical restrictions. When the rumors surfaced in the department when she was called back from CPAP to serve as a patrol officer, that's the time the rumors surfaced in 2006 that she had medical restrictions. Both Chief Box and Chief Martin called her in and said, if you have a medical restriction, we need to be privy to that. It was never provided. They never had any access to medical restrictions in this particular case. And everybody testifies that she had to work full duty. I'm sorry. I thought Martin didn't testify. Martin did not testify, but Chief Box, and no objection was made to it, testified that Chief Martin would have access to those and he would also be privy to those. And he recalled the conversation where Chief Martin called her in the office to say, if you have a medical restriction, we have to have knowledge of that. But when she went back to work, her physician testifies that he released her to work with a 25 pound lifting restriction in 2002. I think it was in August. How do you, how does she go back to work and is accepted by University Park, by the village, with this notation from her doctor? I mean, do they ignore it? Do they let her come to work without bringing it? How is it that she ever got back in the door when this restriction was placed there by a physician back then? The fact is, Your Honor, a good question. There was no restriction. Everybody has testified that nobody had any knowledge of restrictions, were never provided medicals, even though those were requested in 2006. Everybody testifies she went back to full duty. In investigation, she even availed herself of the sergeant exam, which by definition has supplied in the record, requires full duty. So in 2002, she just can walk in one day and announce, I'm healed, I'm good, I'm back for full duty. She did that back in 2002 because she worked full time and she requested the assignment to CPAP where she was an undercover narcotics officer. And they all testified she can't have that job because she's got a restriction. Nobody told us she had a restriction. She didn't tell us she had a restriction. Were Sweeney's records not available to them? I can't answer that question. My only answer to that is there were no restrictions at that time. And nobody identified restrictions. How is it that an individual comes back to work after having been off? So the chief of police just says, oh, nice to see you back. There's no documentation or nothing that an individual... She asked to be cleared to come back and she was cleared to come back to full duty because that's what she served. But you're saying that, to try to help this along because it's taken up a lot of time, you're saying that just the actual fact that she returned to full duty is sufficient. Well, I'm saying that that's what she's performed and nobody was aware or provided any information with the identification. Just the surprise question is that, how is it that you just come back? Is it just the word of the officer, hey, I'm back? They have to be cleared to come back, Your Honor. They have to be cleared. What has to be produced for clearance to come back? Well, I would assume that in most all these cases, for clearance, it's a statement from the doctor that you can perform full duty. But this record says that there's a statement from Dr. Sweeney that she has a 25-pound weight limit. Well, I think that that's a statement that's coming forth later in the day. But at the time, she was obviously cleared to come back to work because that's what she did and everybody stated that she performed full duty as a police officer as required. There was no light duty and certainly no light duty for five years. So what you're saying is that the doctor did not, in fact, have this weight restriction and he's just testifying to it later? I can't state what happened with the department or what happened with the village. All I can state is that she was able to perform full duty and I can state that the testimony was crystal clear in this particular case. That the department, the chief, her supervisor, had no knowledge or any information, even though it was requested of her, that there was any medical restriction. None. Is Sweeney's original report when she came back in 2002, is Sweeney's original report or diagnosis... I can't answer that. I can only answer that from this standpoint as far as the board was concerned. They determined, even with the medical evidence before them and with the testimony before them, that the 2006 accident was the cause of the disability in this particular case. And there was competent evidence to support that. I believe there is competent evidence in the record to support that. And competent evidence to support that she was working full duty and not light duty in this particular case. Just let me touch on the capacity issue as far as an off-duty injury. All the cases, whether it be White, Fedorsky, Ahm, all those cases. I acknowledge that the courts have been challenged to find unanimity as far as the decisions, as far as the application of active duty as far as capacity in these cases. But one thread runs through all of those cases, and that is that the plaintiff was on duty at the time of the injury. If we're going to suggest in this case that somebody is on duty 24-7, then I suggest we throw out the statute, give everybody a line-of-duty disability who is injured at any time 24-7, no matter what the situation is. That's not the purpose of the legislation. That's not how it should be read. We ask the court to sustain the board's decision in this particular matter. Any more questions? Okay, thank you, Mr. Adler. Thank you. And Mr. Sweeney, you have five minutes. Thank you. Good morning. Please, the court, counsel. Robert Sweeney for the Village of University Park. I'd like to follow up on your point, Judge, concerning Dr. Sweeney. Dr. Sweeney did not testify at this hearing. The only evidence from Dr. Sweeney were medical records, but there was no testimony from Dr. Sweeney at all. As to the actual mechanism of returning to work, there's nothing in the record addressing that. Frankly, as I stand here, I don't know the answer to that. Maybe that another clinician cleared her. Maybe that Dr. Sweeney provided clearance and didn't note the restriction. To be honest, I don't know what the answer to that is as we stand here now. So in University Park, the injury occurs and then they just come back? No, there certainly would have been some type of clearance. There certainly would have been some type of mechanism showing her clear to return to work. And the evidence is clear in the record that there was no light-duty position available where they would have accepted any restriction. So by inference, we know it's clear from Deputy Chief Box that no evidence of restrictions was provided. By inference, of course... To him, but Chief Martin, who she would have given that to, failed to appear pursuant to the subpoena? There's not a subpoena in the record either, Judge. But he was requested or he just did not... he's not there, he doesn't... I don't know the standard that he was either subpoenaed either, to be quite honest. But there was no objection that he had failed to appear made during the hearing either. But Deputy Chief Box is not... or he was shooting. Is that who she should have turned that in to? Deputy Chief Box would have been privy to that either back in 2002 or certainly in 2006 as he had risen up to become her supervisor. And he also testified, as counsel alluded to, that he was also privy with Chief Martin to the fact that in 2007, when she tried to return to work and there was a rumor, not an assertion explicitly, but a rumor that she had some type of restriction, it was then Chief Martin who called her in to say, if there is some restriction here, we need documentation of it. It had not been in her file for five years. She had been working undercover narcotics and gambling work. And Detective Reichenberger had testified, we wouldn't accept a police officer with any kind of physical restriction to go undercover to do narcotics and gambling work. Do we... is there in the record, Sweeney's report, or I assume that it's Sweeney's report because he was treating her then in 2002? Yes, sir. And my assumption is, and maybe I'm incorrect, but that was part of the clearance, was the medical report? To the contrary. The report is in the record now and was brought at that hearing. But the testimony was, there was no knowledge of that O2 report at the time. There was no knowledge of restrictions at the time. There was no knowledge of the report or there was no knowledge of the restrictions? Either. There was no knowledge of restrictions when she came back. Cut to the quick. If she showed up with a doctor's statement that said, I have a weightlifting restriction, this was in O2, she wouldn't be employed? That's correct. Okay. And in fact, here's what would have happened. Because even if that had been brought up in O2, there's nothing in the law that says a treater's restrictions are conclusive. If anything, that might have triggered then a review by a panel of three independent physicians. And when that happened in O7, those three physicians said, one, this is a result of a combination of the two accidents. Doctor two said, it's a result only of the second accident in O6. And doctor three said, she's fit to return to duty without restriction. That's what I'm really just trying to get at, is that when she comes in O2, and what you're saying is that there's no knowledge of any restriction. What I'm trying to get at is, what did she present to go back to work? Judge, as I stand here, I don't know, and I'm afraid it's not in the record. Certainly something would have been presented, but it's not in the record. One minute. Thank you. Swimming's report is in the record. Correct. Remote. Correct. Along with the testimony concerning the fact that they would not have accepted restrictions. So what we have here now, even as of O7, three independent doctors who can't even agree whether she's actually disabled at all. Much less the causation, much less the duration. So it's hardly against any manifest way when determining that factual issue of causation. The board determined now that the causation flowed from O6. You're saying it's sufficient in the record that there is some evidence to support the board's decision? Absolutely, sir. Okay. And that's what you have to show? Absolutely. Absolutely. Okay. Thank you for your time. We're done. Thank you, Mr. Swing. And Mr. Duda, any rebuttal? You have five minutes. May it please the court. Counsel actually said what I wanted, the point I wanted to make. All of these statements as to how police officers return to work at University Park, there's nothing in the record. Nothing. Nothing, nothing, nothing in the record about that. Mr. Atwell's description of hearsay conversations that weren't objected to between Box and Martin are not in the record. Not in the record. Look at pages 160 of the record for about the next 15 pages, you'll see Officer Box, who actually said, I really, you know, I'm really not that familiar. I mean, he said, you know, are you familiar? And he says, somewhat. That's not a particularly effective answer. The only rebuttal I would have is I know that this verbiage appears in cases, Justice Holeridge, I do not believe that manifest weight of the evidence is reduced. But if there's some evidence, we stamp it. I mean, I think that the Wade case and the Boland case that say even when the decision is supported by some evidence, which if it was undisputed would sustain the finding, it is not sufficient if upon consideration of all the evidence, the finding is against the manifest weight of the evidence. So even if there's some evidence in this case, that's not enough for the Board to get past this. And I want to conclude. I didn't have the page number. It's page 298. And this is what Dr. Sweeney says in November of 2007. It says, Gwendolyn Buckner was seen in the office November 29, 2007, nine months after her fusion. She apparently was not taken back to work light duty despite the fact that she has had these same restrictions for five or six years. You know, that's the record. That is in the record. That's why I say it's against the manifest weight of the evidence. The only evidence that the Board has to support its decision isn't in the record. We wouldn't have taken her back if she had restrictions. We did take her back, and there's no evidence offered by anybody that she went through a pre-employment physical or that didn't like her restrictions. There's no evidence. If that's so important, if that's what they need to sustain it, it's not in the record. It's against the manifest weight of the evidence. Thank you. Okay. Well, thank you, Mr. Goodwin. Thank you all for your argument today. We will take this matter under advisement to protect you with a written disposition within a short period. And we'll take a short recess for a panel discussion.